Edward W. WIRTH and Charlotte Wirth,
Respondents,

v.

Gloria E. HEAVEY, Appellant.

No. KCD 26259.

Missouri Court of Appeals,
Kansas City District.

April 1, 1974.

William C. Paxton, Independence, for appellant.

August V. Spallo, Kansas City, for respondents.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

SHANGLER, Judge.

The plaintiffs Edward Wirth and Charlotte Wirth brought an action in the magistrate court on a promissory note against defendants James D. Heavey and his wife Gloria E. Heavey. The plaintiffs had judgment and defendants took an appeal to the circuit court. Before trial, plaintiffs entered into a joint stipulation dismissing with prejudice the claim against James D. Heavey after he received a discharge in bankruptcy of the debt underlying the note given by him and his wife to plaintiffs Wirth. After hearing evidence, the circuit court entered judgment for respondents against defendant Gloria E. Heavey for $3,083.77 and she appeals.

The plaintiffs Wirth were formerly partners with appellant and her husband in the operation of a Mugs-Up Root Beer Drive-In. The Wirths sold their interest in the business to the Heaveys and took as payment a promissory note for $4,000 payable in monthly installments of $77.33 beginning July 15, 1968 and on the 15th day of each succeeding month with interest at the rate of 6% per annum. Contemporaneously the Heaveys executed a security agreement covering the business equipment. In addition, the Heaveys entered into a five-year lease of the drive-in premises with the Wirths who were the owners of the building which housed the business. A monthly rent of $125.00 was payable on the 15th of each month beginning June 15, 1968.

The payments on the note were made regularly through September 15, 1969, but the October 15 payment was not made on time, and on October 24, 1969, plaintiffs made demand for the total balance remaining [$3,109.31]. At the same time they gave notice that the collateral described in the security agreement would be sold by private sale on or after November 3, 1969. The defendants remitted a check for the October payment accompanied by a letter dated October 27, 1969, but plaintiffs refused payment and returned the tender to the Heaveys on October 29th.

Plaintiffs advertised the collateral for sale in the Kansas City Star and in response received several bids: (1) $310 for two refrigerated root beer barrels, (2) $350 for the same barrels, and (3) bids of $500, $450, $400 and $150 for all of the equipment. Most of these bids were ob-

tained from other Mugs-Up operators although two came from restaurant equipment suppliers. Edward Wirth gained access to this equipment by breaking the lock on a door of the drive-in premises. After the equipment was exhibited to the prospective bidders, plaintiffs themselves purchased all the secured items for $650. Plaintiffs, in turn, resold to a Mugs-Up operator for $350 the two refrigerated root beer barrels which had been bid at that amount. The plaintiffs notified the Heaveys of the proceeds of the sale and made demand for the deficiency balance; the same letter notified them that plaintiffs were holding certain supplies [such as cups, cartons, concentrates] not subject to the security agreement but belonging to defendants, which would be sold if not promptly claimed. In absence of response, plaintiffs sold the non-secured inventory for $134 but allowed defendants no credit.

It was the evidence of defendants that the value of the collateral covered by the secuirty agreement was $3,500 and that this equipment was functioning well when the drive-in was closed at the end of September of 1969. They had purchased part of this equipment in used condition for $1,000 in 1966. The plaintiff Edward Wirth testified that there was not much market for used restaurant equipment and hence it was difficult to obtain bids for such merchandise. He knew of no standard price quotation for such used equipment. The defendant James D. Heavey confirmed that some of the equipment was designed and labeled specifically for Mugs-Up franchise operations and thus was of little interest to other drive-in enterprisers.

The answer of defendant Gloria E. Heavey, the only appellant here, alleged certain irregularities in the disposition of the collateral at private sale by plaintiffs and asserted also a claim for affirmative relief, actual and punitive damages for the conversion of the non-secured inventory. The plaintiffs replied alleging that the personal property was not converted but sold only after it had been abandoned by failure of defendant to remove it after notice to do so was given her.

The court determined that the private sale of the collateral by plaintiffs was conducted in a manner conformable to § 400.-9–504(3), RSMo 1969, V.A.M.S. The court determined also that after crediting the note with $650 the remaining deficiency, including interest and attorney fee, amounted to $3,317.79 but that defendant was entitled to a further credit for the $134 derived from the sale of the non-secured inventory and, accordingly, entered judgment for plaintiffs for $3,083.77 on their petition. The court treated the claim for conversion asserted by defendant in her answer as a setoff, found that defendant had abandoned the property, that the sale by plaintiffs was lawful, and denied punitive damages.

The defendant-appellant asserts as her first point of error that by virtue of § 400.3–606 [1] the dismissal with prejudice against the co-defendant husband without a reservation of rights by plaintiffs or her consent operated as a complete discharge of her liability on the note; she claims therefore that the trial court erred in denying her earlier motion for summary judgment. In fact, the stipulation of dismissal filed by plaintiffs and appellant's husband contained no reservation of right to proceed against the appellant as comaker of the note; nor was there any evidence that appellant consented to the dismissal. We conclude, however, that in the circumstances of this case the dismissal with

[1]. In relevant part, § 3–606(1) provides:
The holder discharges any part to the instrument to the extent that without such party's consent the holder
    (a) without express reservation of rights releases or agrees not to sue any person against
whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person . . . .

prejudice was without legal effect to discharge the obligation of appellant as co-maker of the note and did not amount to a release within the meaning of § 3–606. The record clearly shows that while this action was pending in the magistrate court James Heavey filed his debtor's petition in bankruptcy and scheduled the plaintiffs as creditors on the note which is the subject of this litigation. Final discharge in bankruptcy was given James Heavey on November 9, 1971. Prior to the amendment of 11 U.S.C. § 32 of the Bankruptcy Act in 1970 by Public Law 91–467, the effect to be given a discharge in bankruptcy could be litigated in any forum. Robertson v. Interstate Securities Company, 435 F.2d 784, 786[1, 2] (8th Cir. 1971). It was the purpose of the 1970 amendment to relieve bankrupts from the harassment of such multiplicity of actions by reposing the question of dischargeability exclusively in the bankruptcy court. In re Burns, 357 F. Supp. 176[1] (D.C. Kansas 1972). [For a resume of the legislative history, see U.S. Code Cong. and Admin.News 1970, Vol. 1, page 1156 et seq.] Conformably to the provisions and intendment of 11 U.S.C. § 32 the order of discharge entered on James Heavey's petition in bankruptcy declared:

2. any judgment heretofore or hereafter obtained in any court other than this court is null and void as a determination of the personal liability of the bankrupt . . .

3. all creditors whose debts are discharged by this order are enjoined from instituting or continuing any action . . . to collect such debts as personal liabilities of the bankrupt

Thus, the dismissal by plaintiffs of their action against the co-maker James Heavey was an act without legal effect because any judgment taken against him on the indebtedness already discharged in bankruptcy would have been rendered null and void by 11 U.S.C. § 32. We conclude, then, that the discharges provided by § 3–606, even if the appellant wife as a co-maker was oth-

erwise entitled to them, are of no avail to her in these circumstances. § 400.1–103 RSMo 1969, V.A.M.S.

Appellant next contends that she was entitled to actual and punitive damages against plaintiffs for the forcible entry into the leased premises for the repossession of the collateral and for the conversion of the non-secured inventory.

■ The right of a secured party to repossess the collateral after default, provided it can be accomplished without a breach of the peace, is established by § 400.9–503. Appellant contends that the rupture of the lock on the door of the drive-in by plaintiffs was not a peaceful self-help repossession. The Code does not define "breach of the peace", nor are we called upon to do so. The collateral was kept in premises leased from plaintiffs. Appellant and her husband had been in default in the payment of rent under the lease since September 1969. Demand for payment of the rent had been made to the Heaveys in that month. On October 6, 1969, they were given notice by plaintiffs that the lease was terminated according to its terms. The lease provided that upon breach the lessors would have the right to re-enter and take possession of the premises without judicial proceeding. The trial court found that the lease had been breached. It is a finding amply supported by the evidence and not contested by appellant here. Nor has appellant raised any question about the validity and enforceability of the lease agreement. There can be no breach of the peace by a party forcibly entering premises to which he is entitled to possession.

As for the claim of conversion, the trial court determined that there was personal property at the drive-in not covered by the security agreement. This property was sold by plaintiffs for $134 for which the trial court allowed an additional credit against the note balance. Appellant claims error in failing to award punitive damages, but her argument ignores the determinative

finding: that the non-collateral inventory had been abandoned. In their reply plaintiffs pleaded the affirmative defense, and the court found as a fact, that appellant and her husband had abandoned the property.

Conversion is an unauthorized assumption and exercise of the right of ownership over the personal property of another to the exclusion of the owner's right. Kegan v. Park Bank, 320 Mo. 623, 8 S.W.2d 858, 871[16,17] (1928); 89 C.J. S. Trover & Conversion § 1. "[T]he characteristic element of abandonment is the voluntary relinquishment of ownership whereby the thing so dealt with ceases to be the property of any person and becomes the subject of appropriation by the first taker . . . [A]bandonment divests the former owner of title to the property so that it becomes as to him as if he had never had any right or interest therein." Rodgers v. Crum, 168 Kan. 668, 215 P.2d 190, 193[3–5] (1950); 1 Am.Jur.2d, Abandoned Property, § 24. If shown, abandonment of personalty is a complete defense to an action for conversion and precludes recovery. Jones v. Jacobson, 45 Wash.2d 265, 273 P.2d 979, 980[1] (banc 1954); Rodgers v. Crum, *supra,* l.c. 215 P.2d at 193[3–5]; 18 Am.Jur.2d, Conversion, § 71. Abandonment of property requires intent plus an act. A sufficient act is one that manifests a conscious purpose and intention of the owner of personal property neither to use nor to retake the property into his possession. Linscomb v. Goodyear Tire & Rubber Co., Inc., 199 F.2d 431, 436[8] (8th Cir. 1952). The intention to abandon may be inferred from strong and convincing evidence. Gibson v. Sharp, 277 S.W.2d 672, 679[10] (Mo.App.1955). Appellant does not dispute the findings of the trial court that she abandoned the non-secured personal property to plaintiffs, and we have no reason to disturb that finding. Notice was sent to appellant and her husband that the property was available and could be claimed yet they neither claimed nor made other response. Whether on principles of abandonment or implied assent [Kegan v. Park Bank, *supra,* l.c. 8 S.W.2d at 871], the conduct of appellant constitutes a complete defense to her claim of conversion and she could suffer no damage from the subsequent sale of the property.

Appellant's final point is that plaintiffs were not entitled to a deficiency judgment because of their failure to follow the default procedures of § 400.9–501 et seq. When the debtor is in default, the secured party has the rights and remedies provided in Part 5 of the chapter and those in the security agreement. § 400.9–501(1). The secured party has available three basic remedies: (1) dispose of the collateral by public or private sale or any other commercially reasonable manner [§ 400.9–504(3)]; (2) propose a retention of the collateral in satisfaction of the debt [§ 400.9–505(2)]; or (3) reduce the claim to judgment or otherwise enforce the security interest by any available judicial procedure [§ 400.9–501(1)]. The secured party is also afforded the right to take possession of the collateral on default if it can be accomplished without a breach of the peace. § 400.9–503. Appellant contends that plaintiffs failed to comply with Article 9, Part 5 in that the collateral was not of a type customarily sold in a recognized market or the subject of a widely distributed standard price quotation so that plaintiffs [as the secured party] were prohibited by § 400.9–504(3) from purchasing the collateral at private sale. Appellant contends that as a result of this alleged breach, plaintiffs should not only have been denied a deficiency judgment, but that she was also entitled to the statutory penalties provided for § 9–507(1).

Section 400.9–504(3) provides that the secured party may dispose of the collateral by public or private proceedings. But ". . . every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable". Although the Code does not define

"commercially reasonable", § 9–507(2) offers some guides:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

■ The trial court found that at all times plaintiffs had acted reasonably in disposing of the collateral. There would be no basis for cavil at this finding except that the secured parties themselves purchased the collateral at a private sale. § 9–504(3) provides:

> The secured party may buy at public sale and if the collateral is of a type customarily sold in a recognized market, or is of a type which is the subject of widely distributed price quotations, he may buy at private sale.

Although the parties disagree on the definitions of "recognized market" and "price quotations", their testimony is in substantial agreement that there was not a widespread market for used restaurant equipment and particularly for the kind specially designed for the use of a particular franchise. All the parties testified they knew of no standard price quotations. We do not agree with the contention of plaintiffs that the type of collateral involved here falls within either of the qualifying tests for purchase at a private sale by the secured party. The few cases dealing with the question indicate that a "recognized market" is one where "sales involve items so similar that individual differences are non-existent or immaterial, where haggling and competitive bidding are not primary factors in each sale, and where the prices paid in actual sales of comparable property are currently available by quotation." Nelson v. Monarch Investment Plan of Henderson, Inc., 452 S.W.2d 375, 377[2] (Ky. App.1970). We do not agree with the contention of plaintiffs that the collateral was of a type that could be purchased validly by the secured party at private sale.

■ It is apparent that if the private sale of collateral by plaintiffs was improper, it violated §§ 400.9–501 and 400.9–507 and the debtor is entitled to a remedy. Appellant claims that she is entitled to a statutory penalty under § 9–507(1). That minimum recovery, however, applies only to cases involving consumer goods. See § 9–109. The collateral in question here does not fall within that definition. Appellant claims, also, that plaintiffs should be denied a deficiency judgment. The Code itself does not mention the denial of a deficiency as a remedy, nor has any Missouri case so held. § 9–507 provides that "if the disposition has occurred, the debtor . . . has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part." Some states, following the lead of the Georgia Court of Appeals,[2] have denied creditors deficiency judgments for their violation of Article 9. Such a sanction, however, does not suit the circumstances of this case. What appears to be a more just remedy for creditor misbehavior under Article 9 was expressed by the Arkansas Supreme Court in Norton v. National Bank of Commerce, 240 Ark. 143, 398 S.W.2d 538 (1966) l.c. 542:

> We think the just solution is to indulge the presumption in the first instance that the collateral was worth at least the amount of the debt, thereby shifting to

---

2. Moody v. Nides Finance Co., 115 Ga.App. 859, 156 S.E.2d 310 (1967); Johnson v. Commercial Credit Corp., 117 Ga.App. 131, 159

S.E.2d 290 (1968); see, also, 64 Northwestern University L.Rev., 808, 828 (1970).

the creditor the burden of proving the amount that should reasonably have been obtained through a sale conducted according to law.

Taken in that light, the evidence supports the determination of the trial court that plaintiffs were entitled to a deficiency judgment in the amount of $3,083.77. Appellant and her husband valued the collateral at $3500. Plaintiffs valued it at approximately $650, the price obtained. We may properly consider that much of this equipment had been purchased used for $1000 in 1966 and, also, that the note for $4000 in 1968 was given, also, in part for the sale of an ongoing business. The trial court could have determined properly that the price obtained upon sale of the collateral was reasonable and that appellant suffered no compensable damage.

Accordingly, the judgment of the trial court is affirmed.

All concur.